GRIFFIN, RESPONDENT, *v*. CHICAGO, MILWAUKEE & ST.
PAUL RY. CO. ET AL., APPELLANTS.

(No. 5,193.)

(Submitted May 3, 1923.   Decided May 26, 1923.)

[216 Pac. 765.]

*Personal Injuries—Master and Servant—Railways—Negligence*
*—Low Wires—Notice of Defect—Time—Complaint—Suffi-*
*ciency—Excessive Verdicts.*

Pleading—Complaint—What to Contain.
   1.   The complaint in any kind of action must allege all facts upon
which plaintiff seeks to recover, disclosing clearly therein the presence
of all the necessary elements upon which he predicates his demand.

Same—Complaint—When Sufficient.
   2.   A complaint will be held sufficient if a cause of action is stated
upon any theory.

Personal Injuries—Negligence—Complaint—Necessary Allegations.
   3.   Actionable negligence arises only from a breach of legal duty,
and to state a cause of action for damages resulting from negligence
the complaint must allege the duty, its breach, the resulting damages
and that the breach of duty was a proximate cause of the injury.

Same—Master and Servant—Negligence—Failure to Inspect and Repair—
Knowledge of Dangerous Condition—Essential Allegation.
   4.   In a personal injury action there must be a causal connection
between the negligence alleged and the injury, and where it is sought
to hold an employer liable for so carelessly permitting a condition to
exist as to bring about injury to plaintiff employee, the complaint
must set forth facts disclosing knowledge on the part of the former,
actual or constructive, of such condition, and failure or refusal to
remedy it within a reasonable time.

Same—Constructive Notice of Defect—Time—Complaint—Sufficiency.
   5.   In an action by a brakeman to recover damages for injuries
sustained by being thrown from the top of a freight-car by tele-
phone wires strung across defendant company's track, complaint
charging negligence on the part of defendant in failing to inspect
its track "for several days" prior to the accident and knowingly
for the same length of time permitting the wires to hang so low
as to endanger the safety of its employees, *held* to allege constructive
notice of the dangerous condition sufficiently specific to enable de-
fendant to meet the charge of negligence.

Same—Duty of Master to Inspect and Remedy Defect.
   6.   Proof that sagging telephone wires strung across defendant rail-
way company's track were maintained by a telephone company and not

3. Sufficiency of general allegations of negligence, see note in 59
L. R. A. 210.
5. Injury to trainman by overhead wires, see note in 47 L. R. A.
(n. s.) 497.

[67 Mont. 386.]

by it and that the former had made efforts to repair the dangerous condition to trainmen did not absolve the railway company from its duty to use ordinary care to discover and remedy the obstruction by reasonable inspection of the track prior to the passage of the train upon which plaintiff was at work.

Same—Excessive Verdict.

7. Plaintiff brakeman at the time he sustained injuries was thirty-five years of age, married and had three children. He was then earning $150 a month; while his vision was impaired to some extent by his fall from the top of a freight-car, rendering him unconscious, experts testified that his eyes could be materially aided by the use of proper glasses, and neither his mind nor his memory was materially affected. *Held*, that a verdict for $20,000 was excessive and reduced to $7,500.

*Appeal from District Court, Gallatin County; B. B. Law, Judge.*

ACTION by Guy Griffin against the Chicago, Milwaukee & St. Paul Railway Company and another. Judgment for plaintiff, and defendants appeal. Affirmed on condition that plaintiff consent to reduction of verdict.

*Messrs. Murphy & Whitlock* and *Messrs. Keister & Bath,* for Appellants, submitted a brief; *Mr. W. L. Murphy* argued the cause orally.

An allegation of constructive notice to be sufficient must allege a definite time during which the condition existed and must allege facts showing that reasonable care if exercised would have disclosed the condition during that time. Here the allegation fails in both particulars. "Several days" indicates no definite length of time and the most that could be said of it is that it might mean two days or more. It may be slightly more definite than the allegation of a "long time" which has on numerous occasions been held insufficient by our court, but it certainly does not give the defendants the information which they are entitled to have, and which the plaintiff is obliged to give under section 9129, Revised Codes of 1921, which requires a statement of the facts constituting

---

7. Excessiveness of damages in action for personal injuries other than death, see notes in **Ann. Cas.** 1915D, 488; **Ann. Cas.** 1916C, 916; **L. R. A.** 1915F, 30.

the cause of action, in ordinary and concise language. (*Boyle* v. *Chicago, M. & St. P. Ry. Co.*, 60 Mont. 453, 199 Pac. 283; *Fearon* v. *Mullins*, 35 Mont. 232, 88 Pac. 794; *Forquer* v. *Brick Co.*, 37 Mont. 426, 97 Pac. 843; *McEneny* v. *Butte*, 43 Mont. 526, 117 Pac. 893; *Phillips* v. *Butte Jockey Club*, 46 Mont. 338, 42 L. R. A. (n. s.) 1076, 127 Pac. 1011; *Martin* v. *Northern Pacific*, 51 Mont. 37, 149 Pac. 89; *Town of Denton* v. *Chicago, M. & St. P. Ry. Co.*, 63 Mont. 70, 206 Pac. 684.)

To make a case the plaintiff was required to show that the wires in question were down before the train passed, and that they remained down until the time of the accident, and that the defendants knew they were down, or in the exercise of ordinary care should have known that they were down, prior to the accident, and took no steps to remedy the condition, and that this caused the plaintiff's injury.

There is sufficient evidence in the record tending to show that the plaintiff was in fact knocked from the cars by the telephone wires which were suspended over the track of the defendant company. This fact is not sufficient to make a case for the jury. The mere proof of the occurrence here is not sufficient, as the doctrine of *res ipsa loquitur* does not apply. It is apparent here that the wires in question were not under the exclusive control or any control of the defendant, and moreover it is equally clear that the opportunity for knowledge on the part of plaintiff in the preparation of his case was the same as that of the defendants, so that the principle of this doctrine as laid down by our court in the case of *Lyon* v. *Chicago, M. & St. P. Ry. Co.*, 50 Mont. 532, 148 Pac. 386, could not apply. But it has been expressly held in a sagging wire case that the doctrine of *res ipsa loquitur* has no application. (*Louisville & N. Ry. Co.* v. *Mink*, 168 Ky. 394, 182 S. W. 188.)

On the question of the insufficiency of the evidence which we believe is decisive in this case, it is appropriate to call the court's attention to a number of cases involving similar facts. One of the earliest cases is that of *Richmond* v. *New*

*York Cent.,* 18 App. Div. 382, 40 N. Y. Supp. 812, where
the railroad company was held not to be liable for an injury
resulting from a sagged wire where it appeared that the
wire had sagged by reason of a storm occurring shortly before
the accident. (See, also, *Southern Kan. Ry.* v. *Shinn*
(Tex. Civ.), 153 S. W. 636; *Meyers* v. *Detroit Co.,* 166 Mich.
403, 132 N. W. 109.)

In the case of *Louisville & N.* v. *Mink,* 168 Ky. 394, 182
S. W. 188, the court denied liability, there being no sufficient
evidence of the length of time that the wires had been sagged
or of knowledge on the part of the defendant.

This court has so frequently laid down the rule governing
the question of excessive damages that we shall not burden
the court with the discussion of the authority. The following
recent cases set out the correct rule and review the previous
decisions of this court: *Wegge* v. *Great Northern,* 61 Mont.
377, 203 Pac. 360; *Gillespie* v. *Great Northern,* 63 Mont. 598,
208 Pac. 1059; *Everett* v. *Hines,* 64 Mont. 244, 208 Pac. 1063.
Individual instances of amounts which have been passed upon
in other cases are of little help to the court in the absence
of examination of particular facts, but as a matter of general
information upon the subject, we refer the court to an ex-
haustive note in L. R. A. 1915F, page 30, where many cases
are collected. We realize that in cases of this kind the court
is loath to disturb the verdict of a jury, but we feel that
in this case the evidence introduced does not tend to show
permanent disability, and in the absence of such showing the
conclusion is imperative that the jury were influenced by
considerations other than the desire to compensate the plain-
tiff for the injury sustained, and we submit that the trial
court should have granted a new trial upon this ground.

*Mr. C. E. Carlson* and *Messrs. Davis & Michel,* for Respond-
ent, submitted a brief; *Mr. Carlson* argued the cause orally.

The jury found a general verdict for plaintiff. The able
trial court saw fit to approve the verdict and deny a new

trial, and the judgment should not now be disturbed. This case was fairly tried before a court and a jury, and the jury, the tribunal to decide .disputed questions of fact, found in favor of plaintiff. The jury must have some function in our system of jurisprudence, and relative to the question of negligence the language of the supreme court of the United States, in *Jones* v. *East Tennessee B. & G. Co.*, 128 U. S. 443, 32 L. Ed. 478, 9 Sup. Ct. Rep. 118 [see, also, Rose's U. S. Notes], is pertinent: "We see no reason, so long as the jury system, is the law of the land, and the jury is made the tribunal to decide disputed questions of fact, why it should not decide such questions as these as well as others."

MR. JUSTICE GALEN delivered the opinion of the court.

This is an action for damages for personal injury sustained by the plaintiff on or about October 23, 1920, while employed as a brakeman on a freight train operated by the defendant company on its branch line between Bozeman and Menard, as a result of having come in contact with sagging telephone wires across the defendant company's track at Huffine siding. The section foreman having charge of the track at the point where the accident occurred was joined with the railway company as a party defendant. The case was tried to a jury. A verdict was rendered in favor of the plaintiff against both the defendants, wherein his damages were assessed at the sum of $20,000, and upon which judgment was duly entered. The defendants' motion for a new trial having been denied by the court, the cause is now before us on appeal from the judgment.

The plaintiff predicates his right to recovery of damages upon the alleged negligence of the defendants in failing to discover and remedy the condition of the overhanging wires prior to the passage of the train. The plaintiff's complaint was demurred to, both generally and specially by the defendants separately, which demurrers were overruled. During

the trial the separate motions for nonsuit and for directed
verdict, made by each of the defendants, were denied.

Twenty assignments of error are specified by the defendants,
but in our view of the case but three questions raised need be
considered for its proper disposition, *viz.:* (1) The sufficiency
of the complaint; (2) the adequacy of the evidence; and (3)
excessiveness of the verdict. These questions will be considered
in their order.

1. The negligence of the defendants resulting in plaintiff's
injury is alleged in the complaint to have consisted of negli-
gently and carelessly failing to inspect the track at the point
of the accident for "several days," and in negligently, reck-
lessly and carelessly allowing and permitting the telephone
wires to hang over the railroad track at the place of plaintiff's
injury at the "time and for several days previous thereto,
* * * at such a distance above said tracks and so near
thereto that it was and became dangerous and unsafe for
employees of the defendants riding on top of said cars to
properly perform their duties thereon, and to be on and about
the top of said cars; * * * that said defendants and each
of them * * * well knew the existence of said wires and
of the fact that the same were over said tracks and at such
a distance that the same would not allow sufficient clearance,
and at such a distance so that the same was dangerous and
unsafe, * * * but that the defendants, and each of them,
negligently, recklessly and carelessly failed and neglected to
take any steps whatever to remove said wires or to raise the
same so that workmen could be on and about the tops of rail-
way freight-cars without danger of being caught by said
wires; * * * that while this plaintiff was so employed by
defendant railway company * * * and was on top of one
of defendant railway company's railway freight-cars, acting
within the scope and course of his employment, * * * said
defendant railway company * * * negligently and care-
lessly ran said train into and against said overhanging wires,
and said plaintiff was caused to be caught in and by said wires

so hanging over said tracks, and as a result  *  *  *  was thrown from the top of one of said cars to the ground and sustained severe and permanent injuries.''

The complaint must state the facts constituting the cause of [1, 2]  action in ordinary and concise language.  (Sec. 9129, Rev. Codes 1921.)  The plaintiff is required to allege all facts in his complaint upon which he seeks to recover, disclosing clearly therein the presence of all the necessary elements upon which he predicates his demand (*Ellinghouse* v. *Ajax Livestock Co.,* 51 Mont. 275, L. R. A. 1916D, 836, 152 Pac. 481; *Chealey* v. *Purdy,* 54 Mont. 489, 171 Pac. 926), and the allegations of a complaint are sufficient wherein a cause of action is stated upon any theory.  (*Hicks* v. *Rupp,* 49 Mont. 40, 140 Pac. 97; *Marcellus* v. *Wright,* 51 Mont. 559, 154 Pac. 714; *Decker* v. *Decker,* 56 Mont. 338, 185 Pac. 168; *Wing* v. *Brasher,* 59 Mont. 10, 194 Pac. 1106.)  These rules are applicable to all actions, whatever their nature, the provisions of the Code being the exclusive guide in this state.  (*Ellinghouse* v. *Ajax Livestock Co., supra.*)

''Every person who suffers detriment from the unlawful [3]  act or omission of another may recover from the person in fault a compensation therefor in money, which is called damages.''  (Sec. 8659, Rev. Codes 1921.)  Actionable negligence arises only from a breach of legal duty, and to state a cause of action for damages resulting from negligence the complaint must allege the duty, its breach, the resulting damages and that the breach of duty was a proximate cause of the injury.  (*Ellinghouse* v. *Ajax Livestock Co., supra; Fusselman* v. *Yellowstone L. Co.,* 53 Mont. 254, Ann. Cas. 1918B, 420, 163 Pac. 473; *Barry* v. *Badger,* 54 Mont. 224, 169 Pac. 34; *Ecclesine* v. *Great Northern Ry. Co.,* 58 Mont. 470, 194 Pac. 143; *Grant* v. *Nihill,* 64 Mont. 420, 210 Pac. 914.)  There [4]  must be a causal connection between the negligence alleged and the injury (*Bracey* v. *Northwestern Imp. Co.,* 41 Mont. 338, 137 Am. St. Rep. 738, 109 Pac. 706), and it is elementary that to charge negligence in such a case as this

the complaint must set forth the facts disclosing knowledge on the part of the defendants, actual or constructive, of the obstructions, and failure or refusal to remedy the same within a reasonable time. (*McEnaney* v. *City of Butte*, 43 Mont. 526, 117 Pac. 893; *Phillips* v. *Butte Jockey Club*, 46 Mont. 338, 42 L. R. A. (n. s.) 1076, 127 Pac. 1011; *Boyle* v. *Chicago, M. & St. P. Ry. Co.*, 60 Mont. 453, 199 Pac. 283; *Town of Denton* v. *Chicago, M. & St. P. Ry Co.*, 63 Mont. 70, 206 Pac. 684.)

Tested by these fixed standards, we hold the complaint [5] sufficient. Although much surplus language is employed, a cause of action is clearly pleaded, based upon the negligence of the defendants in failing to inspect the railroad track at the place of the accident "for several days" prior thereto, knowingly permitting the telephone wires to hang over the railroad track so near thereto as to endanger the safety of employees of the railroad company in the course of their employment, and in negligently and carelessly running the train into and against such overhanging wires, resulting in plaintiff's injury.

We appreciate that this court has heretofore ruled that a complaint alleging the existence of a defective condition *"for a long time"* prior to an accident is too indefinite to impose any duty to make repairs (*Martin* v. *Northern Pac. Ry. Co.*, 51 Mont. 31, 149 Pac. 89; *McEnaney* v. *City of Butte, supra; Phillips* v. *Butte Jockey Club, supra; Boyle* v. *Chicago, M. & St. P. Ry. Co., supra*), and therefore fails to state a cause of action. In those cases, however, there was reason for the application of such rule under the ultimate facts alleged constituting the basis of plaintiff's right of recovery. They are clearly distinguishable. They are predicated on the necessity of alleging notice to defendants, actual or constructive, of the existence of the defects causing injury for a time definite prior thereto. The *Martin Case* involved the liability of the defendant company for the death of a seven year old boy in its yards, under a complaint alleging that a freight-car, in

which the boy had been playing when killed, had been left in a "defective condition *for a long time* prior to the date of the accident." It was held too indefinite to place a duty on the defendant to make repairs. The *McEnaney Case* involved the sufficiency of plaintiff's complaint for damages on account of personal injury alleged to have been caused to plaintiff by falling upon a sidewalk, because of the city's alleged negligence in permitting water to flow across the sidewalk *"for a long time"* prior to the accident, causing ice and snow to accumulate, and the formation of a smooth, slippery and slanting surface. It was held that the complaint was defective, in that it did not state facts from which could be ascertained the length of time intervening between the injury and actual or constructive notice to the city of such dangerous condition. In the *Butte Jockey Club Case,* the plaintiff, who was a patron of defendant's racecourse, having paid admission, while descending a stairway in the grandstand, fell and was injured. She alleged that the cause of her fall was a large nail protruding an inch or more upward through the step of the stairway upon which her clothes caught, and that her injury resulted from the fall and from alighting upon a broken board in the floor of the first landing. It was alleged that the defendant negligently permitted these defects to remain *"for a considerable period of time"* before the day of the injury. The complaint was held fatally defective for failure to allege facts showing that the defendant had notice, actual or constructive, of the defects causing plaintiff's injury. In the *Boyle Case* the complaint was held fatally defective in an action by an employee of the railway for personal injury as the result of the breaking of a defective lever used in the operation of a semaphore, because of its failure to specify the time during which the defendant had knowledge, or in the exercise of ordinary care should have known, of the defects complained of, it being alleged: "That the defendant had negligently and carelessly neglected and omitted to reasonably inspect * * * and likewise negli-

gently and carelessly allowed and permitted the same to remain in said condition *'for a long period of time'* prior to the actual breaking thereof.''

In the case before us, notice of the condition complained of is alleged both constructively and actually. As to constructive notice, it is alleged that the defendants negligently and carelessly failed to inspect the track at the point of the accident *"for several days,"* and negligently, recklessly and carelessly allowed and permitted the telephone wires to hang over the railroad track at the place of plaintiff's injury *"at the time and for several days previous thereto,"* at such a distance above the track and so near thereto that they were dangerous and unsafe for defendants' employees in the performance of their duties. In our opinion these allegations are sufficient to allege constructive notice to the defendants in this case by reason of failure to inspect the railroad track. ''Several days'' prior to the accident is practically as definite as to say, ''Tuesday, Wednesday, Thursday and Friday'' before the accident. Either method of allegation of the ultimate fact gives the defendants definite information of the negligence charged. In the cases above referred to there was no duty of the defendants alleged to have been breached for a time definite sufficient to charge defendants with constructive notice; whereas, in this instance, the defendants are told that the obstructions complained of were by them negligently permitted to remain in such dangerous condition ''several days.'' The charge is sufficiently specific to enable defendants to meet it. Actual notice is also charged as shown by the above *résumé* of the allegations of the complaint.

2. The burden of proof rested upon the plaintiff, and we are now brought to a consideration of the evidence.

It appears that the defendant railway company operates a branch line of railroad in Gallatin county from Bozeman north to Menard, a distance of about twenty-five miles, over which a combination train for the carriage of freight and passengers is operated once a week, on Saturdays. Huffine sid-

ing is located a distance of fifteen miles from Bozeman, near which point there is a highway which crosses the railroad track in an easterly and westerly direction, along which the telephone lines of the Pass Creek Telephone Company, consisting of six wires, are strung, five wires being attached to cross arms and one below held by a bracket, all of which were kept in place at a height of twenty-five feet above the railroad crossing by poles set in the ground fifty feet apart. On Saturday morning, October 23, 1920, at the hour of 8 o'clock, the train operated by the railway company on that branch, comprising ten freight-cars, a combination passenger and baggage car, and an engine was just pulling into Huffine siding, at which point a freight-car next to the engine was to be set out. The last car in the train was the combination coach. The plaintiff was on top of the train proceeding along the running-board toward the head end to assist in expeditiously uncoupling and setting out such car, and while upon the fifth or sixth car from the engine was struck below the knees by the telephone wires, and by reason thereof thrown violently from the top of the moving train to the ground, sustaining the injury complained of. Immediately after the injury to the plaintiff, the cars in the train other than the combination coach were left side-tracked, and the engine attached to the coach proceeded back to Bozeman, carrying the plaintiff, in order to provide him with necessary medical aid and attention.

On Wednesday, October 20, 1920, there was a heavy snowstorm accompanied by some sleet, which hung to the telephone wires, causing them to sag. On Tuesday or Wednesday preceding the accident, the defendant Hulehan, with his section crew, of which one Albert Henry Kirch was one, worked at the point where the accident occurred. Kirch, as a witness for the plaintiff, testified: "I recall that it was Tuesday or Wednesday after the Saturday I first worked there that I worked on this line. I remember at that time of digging out the crossing at Huffine. While I was there, Mr. Hulehan

[67 Mont. 386.]

said to me that the wires overhanging the track were hanging kind of low. I answered that they were, and went on with my work. I noticed the wires there after he called my attention to them. At that time I would say that the wires were seventeen or twenty feet high, in my judgment. The crossing I mention is the crossing just south of the Huffine siding. That is the crossing where Mr. Griffin was injured. I did other work also that day, cleaning tie plates at the Huffine siding. On the following Friday we started out to inspect the track from Bozeman to Menard, but we only got as far as the lower mill. I should judge that is about a mile north of Bozeman. We did not go to Huffine siding and inspect the track clear out there that day—Friday. We had a speeder, and we turned back because there was too much snow on the rail. Mr. Hulehan and Don Chandler were with me. It was the Friday before the accident that we only went about a mile north of Bozeman. We did not inspect the tracks at any point beyond that. * * * On the day of the accident to Mr. Griffin I accompanied the train to Menard. Nothing unusual happened or nothing unusual was called to my attention while I was in the coach just before I got to Huffine siding. I left the coach to help unload freight at Spring Hill. I did not leave the coach just before I got to Huffine siding. I did not get out after I got to Huffine siding. I did get out of the coach that day near Huffine siding. I got out because I heard a noise on top of the cars and stopped the train. After the train was stopped, I got out of the coach. There I noticed something with regard to some wires on top of the train. I noticed there were some wires about the brake staff on the car next to the coach. At that time I also noticed that there were some other wires on the train, and it seems to me it was the fourth car from the engine. After the train stopped, it did not back up right away, but it did shortly after that. When it backed up I saw Mr. Griffin. When I saw him he was on the north side of the crossing, lying on the left-hand side as you are going north. I went

to where Mr. Griffin was lying, and when I reached him he was unconscious. When I reached him, I noticed he was bleeding from the ear, nose, and mouth. I noticed the blood coming from his ear, nose, and mouth. I helped carry him into the coach and accompanied the coach back to Bozeman. During all the time after I picked him up and helped carry him onto the coach, and while he was being brought back to Bozeman, he was unconscious. When I noticed him bleeding at the ear, I noticed that the blood was coming right out of the hole of the ear. It was apparently coming from the inside of the ear. I also noticed that there was a scratch here on his forehead.''

Harrison Adams, a witness for plaintiff, testified: ''I had occasion shortly before he was hurt to be under the telephone wires overhanging the tracks of the defendant company at the crossing just south of Huffine siding. To the best of my recollection that was on Thursday the 20th of October— the Thursday before the accident. That day I had been up to Boomer's helping him fix some flooring for a cow barn. That day when I was coming home Mr. Taylor was fixing the wires down below the crossing. I came along there, and instead of going down the track home I went on out to where he was. The wires were down below him. I saw what he did in trying to remedy the condition of those wires. After he had fixed the wires there where he was, we went on down to the corner and I saw that corner pole there. On that Thursday afternoon when I saw it, it was leaning over quite a bit. * * * On that Thursday after I was there, the wires were sagged down some between the poles. Mr. Taylor did not put them up at the corner; he did not bother the corner at all. He pulled them up over the crossing a little before we went down to the corner and tied them to a fence post. The wires right there which were attached to the pole which was leaning over were hanging down also, but he did not do anything with them that evening. I did not do anything with them that evening either. On the day following—Friday—to the

best of my recollection, I was at my home. On the day
following Friday the accident occurred—Saturday. On the
day before I observed these wires, there had been a storm
around Huffine siding in our locality. To the best of my
recollection, that storm was on the Wednesday night pre-
vious to the day of the accident. That storm was what I
suppose you would call a wet heavy snow, something like
that. Of course it stuck on the wires; early the next morning
all the wires—telephone wires—were bigger.'' And on cross-
examination he says: ''At that time when I crossed the
crossing, Mr. Taylor, being to the west, two telephone pole
spaces away, had already pulled up the wires across the
railroad track the best he could, but he never had them up
anywheres tight. He was just there pulling the wires up
—that was his purpose—just pulling them up with his hands,
and he could not pull them very tight. I could not say
whether he pulled them to a sufficient height over the railroad
track or not; the wires were sagging quite a bit.'' Further,
this witness said the wires were hanging only a distance of
twelve or fourteen feet over the railroad after Taylor had
fixed them on Thursday.

There is no dispute but that on Friday, preceding the acci-
dent, the defendant Hulehan and his helpers started out over
the line to inspect it before the train should be run over
it on the following day, as was customary; and that on ac-
count of snow and ice on the rails he could not run his gas
car farther than about one mile and a half from Bozeman,
was compelled to abandon his inspection, and no inspection
was then made. Defendants' witnesses show positively that
considerable fixing was being done to the telephone line at
the place of plaintiff's injury, for several days preceding
during the week of the accident. Earl Miller testified that
in October, 1920, he was employed as a lineman by the Pass
Creek Telephone Company, and that about October 20, 1920,
and previous thereto, he did some work on the telephone line
near Huffine siding. His testimony and that of defendants'

witness G. R. Taylor leave no question of doubt as to the dangerous condition of the wires over the railroad track the day preceding the accident. Miller says: "I had last worked upon that line previous to October 23, 1920, on Thursday, the 21st. I observed, and it is the fact, that there is a north and south road and an east and west road along which this telephone line runs. I did some work along the north and south road on that Thursday. I made a change in that telephone line there. On the north and south road I moved every pole—I believe there were seven of them—from the railroad pole to the crossing. That was on the north and south road. This is the corner over here [indicating], the point marked 'C.' Those poles were moved from the road east. I did that on Monday; that is, previous to the 23d of October. In connection with that work I reset the poles. I also tightened the line wires all up and refastened them. I completed my work with reference to tightening and straightening the wires about 2 o'clock on Thursday. As to whether at that time I crossed the crossing 1,100 or 1,200 feet south of Huffine siding, I will say that I went under the telephone line between the railroad and the west pole about 2 o'clock that afternoon. When I left there, having completed that work about 2 o'clock Thursday afternoon, the wires over the track were all up just as good as they could be put up. Over the tracks there was approximately a clearance of twenty-five feet. The next time I saw those wires prior to the twenty-third day of October, 1920, was Friday. I saw that between 11 and 12 o'clock on the morning of that Friday. I saw them here at the crossing, between the crossing and the corner [indicating on the plat]. I saw them about 11 o'clock on Friday, the twenty-second day of October, 1920. At that time the corner pole at the corner, the point marked 'C,' dipped over probably fifteen feet. It was out of the hole entirely. After that I went on to town, to Belgrade, which would be south. I returned to that locality that same day, returning between 4 and 5

o'clock. At that time I was equipped with my lineman's tools; I had my pliers, climbers, and belt and everything with me. I was traveling with an automobile. I returned to the vicinity of the crossing 1,100 or 1,200 feet south of Huffine between 4 and 5 o'clock that afternoon. When I reached that crossing, I stopped the car and got out and looked at the wires. I looked at the wires over the railroad track. At that time I was equipped with my tools. At that time I found that the wires were up as good as they ought to be; there was very little sag in them. I would say they were not sagged to the extent of eight inches. At that time I would judge there was a clearance of between twenty-four and twenty-five feet. I stopped my car there at that time."

Taylor says: "I recall the date of an accident to the plaintiff in this case, Guy Griffin, which occurred near this highway crossing and near the telephone line. * * * I was there very shortly after the accident. I had last been at that crossing, and particularly at that telephone line where it crosses the railroad track, the evening before at dark. Previous to that time I had last been at the point where the telephone line crosses the railroad about 2 o'clock in the evening. That would be the day before the accident. When I said I was there about dark the evening before the accident, I mean that that would be on Friday evening. Then on Friday about 2 o'clock I was there at the same place. I had not been at that place any other time on Friday any earlier than 2 o'clock. I recall what took me to that particular place at that time. Our wires were all sagging, and we could not get any service over the line. * * * So, when I got down to the railroad crossing, I found the wires all down to probably within six or eight feet of the rails. That was on Friday. So then I walked on out 300 yards farther to the corner, and I found the corner post out. * * * The linemen were out there working on the line Thursday, and I do not think I was, at least, I do not remember of being, out there. I am pretty sure I was not.

402    Griffin *v.* Chicago etc. Ry. Co. et al.    [Mar. T. '23

[67 Mont. 386.]

When I say the linemen were out there working on that line Thursday, I meant that Earl Miller was out there.   *   *   * When I saw the condition of the wires as they were down, they were also down a considerable distance to the west of the track, out toward this pole that was out. They were hanging down near the ground. After I found the post was out, I came back to the railroad and commenced taking up the slack, and I hung onto the end of the one. line. There were five wires that were on a cross arm, and the sixth wire was on brackets right under the cross. I put up that wire myself. I took up that wire myself. And the bracket broke off of the first post, the high post, beyond the railroad post. I had plenty of slack in my wire and I pulled that wire up and wrapped it around a post. I wrapped it around a fence post of my own fence twice. That wire never was broken at all. Before I went back I commenced taking up the slack at the railroad, over the first pole to the west of the railroad, the first pole beyond the high poles. As to what I did in the matter of pulling up the slack over the railroad, and as to how high I got those wires, I will say that I had them up to normal; that is, to the position they usually and generally occupied. I continued to take up the slack all the way back to the corner; I went from post to post back, taking up the slack as I went back.''

It is shown that the smokestack of the engine extends to a height of fourteen feet six inches above the rail, and that the height of the six cars which were next to the engine, beginning with the first one in line, are as follows: (1) St. P. No. 54104, to top of running-board, 13′ 3″, over all, 14′ 6½″; (2) Penna. No. 93487, to top of running-board, 13′ 519/32″; over all, 14′ 1⅝″; (3) D., L. & W. No. 44189, to top of running-board, 13′ 6⅞″, over all, 14′ 1¾″ (4) A., T. & S. F. No. 30358, to top of running-board, 12′ 8¾″, over all, 14′ 1″; (5) C. & A. No. 36910 to top of running-board, 13′ 4⅝″, over all 13′ 10⅝″; (6) Mo. Pac. No. 16878, to top of running-board, 12′, over all, 14′ 6″. Thus, from the

running-board to the top of the brake staffs the height ranged on these cars from six to thirty inches, and a circular wheel surmounted each brake staff. If the plaintiff was on the sixth car at the time he was struck by the wires, the top of the smokestack and of the brake wheel would be just two feet six inches above the running-board; and were he on the fifth car, the brake wheel would be only six inches above the running-board, so that the wires, being in a sagged and sagging condition, under the physical facts, were high enough to give clearance to the engine and such cars and yet low enough to strike the plaintiff below the knees, more particularly so, being so loosely supported that the vibration of the train would cause them to lower.

In these particulars, the court correctly instructed the jury as to the law, without objection *viz.:* "The only theory upon which the defendants can be held liable is that the wires had been sagged, and that the defendants knew that they had been sagged, or in the exercise of ordinary care should have known it prior to the time the train upon which plaintiff was riding was operated at the point of injury." Further, as to the defendant railway company's duty: "It has the duty only of making reasonable inspections of its tracks at reasonably frequent intervals, and before plaintiff can rely upon any alleged failure to inspect he must show by a preponderance of the evidence that reasonable inspection was not made, and that, if it had been made, it would have disclosed that the wires were sagged so as to leave insufficient room for the passage of trains." On the question of notice: "That to establish constructive notice the plaintiff must prove by a preponderance of the evidence that the wires were sagged a sufficient length of time prior to the accident, so that defendants in the exercise of ordinary care should have discovered them." If the wires were sagged on Wednesday, [6, 7] Thursday and Friday before the accident, and insecurely held in place, as the proof indicates, there having

been a heavy snowstorm in the vicinity on Wednesday, the railway company is liable for its failure to make reasonable inspection of its track before the train was run over it. It is reasonable to assume that had the railway company exercised ordinary care in inspecting its track the indifferent and dangerous condition of the wires would have been discovered. It cannot escape responsibility by proof tending to show efforts made by the telephone company to repair the defective and dangerous condition of the wires over the railroad track. In this case, that proof only tends to accentuate the negligence of the defendant railway company in failing to inspect its track. Although the wires were neither constructed nor maintained by the railway company, yet it owed a duty to the plaintiff to use ordinary care to discover and remedy such obstructions of its track, by reasonable inspection prior to the passage of the train. The case was properly submitted to the jury for determination, and its findings would be by us considered conclusive, were it not for the amount of the verdict.

3. Was the verdict so excessive as to indicate passion and prejudice of the jury? The plaintiff was thirty-five years of age, married, and had three children. At the time of his injury his earning capacity was about $150 per month. He testified that since his injury he has been unable to work, but we are satisfied that the medical testimony does not warrant the conclusion that he is permanently incapacitated. He was rendered unconscious by his fall from the train, and remained so for three days, and was sick in the hospital for about one month. He described his injury and physical condition at the time of the trial as follows: "When those wires hit me I was thrown to the ground from the top of the car. That is the last thing I remember of it. The next thing I remember is being up here at the hospital for nearly a month, and the last week I was there I remember a good bit of what went on there. I do not remember of being brought back

from Huffine's siding into Bozeman, or of being put into the coach. The last thing I remember is being struck by the wires and thrown from the top of the car to the ground. While I was in the hospital at Bozeman, and after I had begun to regain consciousness, I suffered pain. My right arm was sore at the wrist and elbow, and I was also sore all through the shoulders. I also had headaches. I could not just explain the nature of them; it was through the forepart of my head. After I left the hospital I went to my home. After this injury and after leaving the hospital I suffered from headaches. I have had them three or four times a week, and sometimes at night I have them. They have affected me in my sleeping. It is at night they bother me. I wake up, and I have to have my wife put cloths on my head. I have also suffered with my eyesight since having this injury. Before the injury I never wore glasses. I cannot see a great deal with my right eye. My left eye seems a little better if I am any judge of whether it is or not. The condition of my eyesight has continued from the time I got out of the hospital. The condition in regard to my headaches has also continued up to the present time. In moving about I get dizzy at times, especially where those headaches come on I am bothered with dizziness along with it. When I am walking along I get dizzy, it makes me feel like I am going to fall down or run into something. This occurs at frequent intervals with me. Before I was injured I was in good health and was working regularly. In working on the railroad before I was hurt I made $200 a month, and some months I made better than $200. It would all depend on how much time one got in. I would be paid for extra time. Before I was injured I never was troubled with sleeplessness or headaches. Before I was hurt I was never troubled with dizzy spells, and before I got hurt I never was troubled with my eyes. I have not been able to do any work from October 23, 1920, to the present time. I have tried to do work; that

is, I have split kindling along, and I nearly cut my foot off one night down there. I did not hit it, but I had to quit on that account. It was too close a shave for me. When I am trying to do any work I get dizzy, and everything gets crossed up in front of me—anything that comes close to me at all. It is all crossed in below and crossed together. Before I got hurt I do not believe I held my head as I do now. I hold my head as I do now to see where I am going and to see anything that is close to me in order to get around it." On redirect examination he said: "My average earnings just before was hurt I expect would be from $125 to $150 a month. Some months possibly would be better than that. I never kept account of that. But I have my time for every day of my work with the Milwaukee for the past three years. My average earnings before I was hurt was from $125 to $150 a month."

There is conflict in the testimony of the medical experts as to plaintiff's physical and mental condition, and the permanent character of his injury; but all are agreed that he has an impairment of vision. Defendants' expert witnesses say his eyes can be materially aided by the use of proper glasses. As to his mentality, it is noteworthy that he made an excellent witness, indicating recollection of every important detail of fact. He even qualified and gave expert testimony as an experienced railroad man. His testimony demonstrates that neither his mind nor his memory has been materially affected.

From a very careful review and study of all of the evidence respecting the plaintiff's injury, pain and suffering, and viewing same in light most favorable to the plaintiff, we are constrained to the opinion that the award made by the jury is excessive, and that it may only be accounted for on the theory of the passion and prejudice of the jury against the defendant railway company. So that the verdict must be by us reduced to such amount as appears just and rea-

sonable for all of plaintiff's injury, pain and suffering, or the question must be again submitted to and determined by a jury. We favor an end to litigation, and dislike exceedingly to compel expenditure of further time and expense in a determination of the reasonable amount of damages to which the plaintiff is entitled. Mr. Chief Justice Brantly has laid down the rule applicable, which has since been followed by this court, as follows: "Courts are reluctant to interfere with the verdict of a jury, and will not do so, on the ground of excessive damages given under the influence of passion and prejudice, unless it is apparent that their feelings of passion and prejudice have entered into and influenced their decision. Where it is apparent that this is the case, a new trial should be granted, unless it is also apparent that the verdict is otherwise correct, and the ends of justice will be fully served by requiring the successful party to remit the excess. In the latter case, however, it should appear that upon the facts the successful party is clearly, and as a matter of law, entitled to a verdict in some amount, and that the prejudice and passion of the jury have gone no further than to lead them to swell the amount of damages; otherwise, all their deliberations must be deemed to have been permeated by their feelings, and the decision as a whole the result of passion, rather than of their calm, deliberate judgment." (*Helena & L. S. & R. Co.* v. *Lynch,* 25 Mont. 497, 65 Pac. 919; see, also, *Chicago T. & T. Co.* v. *O'Marr,* 25 Mont. 242, 64 Pac. 506; *Wegge* v. *Great Northern Ry. Co.,* 61 Mont. 377, 203 Pac. 360; *Hall* v. *Northern Pac. Ry. Co.,* 56 Mont. 537, 186 Pac. 340; *Gillespie* v. *Great Northern Ry. Co.,* 63 Mont. 598, 208 Pac. 1059; *Everett* v. *Hines,* 64 Mont. 244, 208 Pac. 1063.)

Applying the rule to this case, the judgment is reversed and a new trial ordered, unless the plaintiff shall file his consent in writing with the clerk of the district court of Gallatin county to a reduction of the amount of the judgment to $7,500 within fifteen days after the *remittitur* shall have

been received by the district court of Gallatin county, in which event the judgment so modified is affirmed.

*Reversed and remanded.*

MR. CHIEF JUSTICE CALLAWAY and ASSOCIATE JUSTICE STARK concur.

MR. JUSTICE HOLLOWAY, being absent, takes no part in the foregoing opinion.

MR. JUSTICE COOPER: I dissent. To my mind the award indicates that the jury believed from the evidence that the plaintiff's injuries were very severe and lasting. One physician, an eye and ear specialist, testified that "the tendency of all optic neuritis is to progression" and often results in "a permanent impairment to the vision of both eyes." Another physician testified that he found that the plaintiff was a great deal below par mentally and physically; that "fracture of the skull, together with a concussion of the brain, have a tendency to lower the mentality of the patient and probably produce a form of insanity or epilepsy." The defendant's expert admitted that bleeding from the ears would indicate to him "a fracture of the skull or a severe concussion of the brain." This evidence, in my opinion, amply supports the verdict and repels the thought that it was not the product of dispassionate minds. It may be that, in some instances, jurors, through miscalculation or departing from their oaths, have allowed excessive damages; but, if appellate courts may arbitrarily fix the amount of recovery with no better standard than the present case affords, they can only do so at the expense of judicial principles established as long ago as 1763 and still recognized by courts of great distinction.

In *Huckle* v. *Money*, 2 Wills. 205, Lord Chief Justice Pratt, a jurist of pre-eminent ability, declared that interfering with verdicts "would be laying aside juries." Proceeding, he

further remarked: "It is very dangerous for the judges to intermeddle in damages for torts; it must be a glaring case indeed of outrageous damages in tort, and which all mankind at first blush must think so, to induce a court to grant a new trial for excessive damages."

This sound judicial utterance was expressly adopted by the supreme court of the United States in the case of *Scott* v. *Donald*, 165 U. S. 58, 41 L. Ed. 632, 17 Sup. Ct. Rep. 265.

The order of this court invites the plaintiff to infer that he must accept $12,500 less than the damages fixed by the jury, or submit to the expense and delay attendant upon another trial, and the added chance that the trial court and another jury may be influenced by the views expressed in the majority opinion.

My dissent is limited to the holding that the damages are excessive. With all else said in the opinion, I agree.