REBA E. HANNIGAN, Sole Heir of WILEY R. HANNIGAN, Deceased, Plaintiff and Respondent, v. NORTHERN PACIFIC RAILWAY COMPANY, a Wisconsin Corporation, RICHARD JOHN STIEFVATER, ADRIAN HAROLD RAMBERG, and EARL JOSEPH AYERS, Defendants and Appellants.

No. 10351

Submitted February 13, 1963. Decided August 5, 1963.

As Amended September 5, 1963.

384 P.2d 493

Brattin, Habedank & Cumming, Sidney, Lamey, Crowley, Kilbourne, Haughey & Hanson, Bruce R. Toole (argued), Billings, for appellants.

Milton G. Anderson (argued), Sidney, Floyd O. Small (argued), Helena, for respondent.

MR. JUSTICE DOYLE delivered the Opinion of the Court.

This is an appeal from a jury verdict and judgment in favor of the plaintiff, in the sum of $67,500.

The jury verdict was the result of a fatal crossing accident about three miles south of Sidney in Richland County between the driver of a car, the decedent Hannigan and a freight train of the Northern Pacific Railway Company.

The facts in this tragedy are these: Wiley Hannigan, the decedent, was employed as a general foreman in charge of the

electrical work for Ebasco Services in constructing a generating plant for the Montana-Dakota Utility south of Sidney, east of the railroad tracks and east of Highway 23 involved in this accident. Mr. Hannigan commenced work on this project on April 26, 1957. The accident occurred on September 30, 1957.

The branch-line train of the appellant operating between Glendive and Sidney left Sidney for Glendive shortly after 4:00 o'clock on a dry, clear, sunny day. The train was in charge of conductor McDonough. The two brakemen were Sadorf, the rear brakeman, and Ayres, as the head brakeman. The engineer was Stiefvater and the fireman was Ramberg, who was also a promoted and qualified engineer.

The train consisted of two loads, nineteen empties, and a caboose, and weighed 620 tons. The diesel engine pulling this train weighed 116 tons, and was fifty-four feet and two inches in length and was about fifteen feet in height from the rail.

From April of 1957 to September 30, 1957, the day of the accident, Mr. Hannigan drove daily between the M.D.U. plant and his home in Sidney and crossed the defendant's tracks east of the junction of Highway 16 and 23, and thus was familiar with the crossing. On the afternoon of the accident the last person to talk to the decedent, Hannigan, was Kent E. Williams, master mechanic for Ebasco at the M.D.U. plant, which was about three-quarters of a mile east of the railroad crossing. He and Mr. Hannigan walked to the parking lot of the Ebasco Company. Mr. Hannigan left the parking lot first driving a red 1955 Studebaker. Mr. Williams passed him about 700 feet east of the crossing and blew his horn and waved and Mr. Hannigan waved back. At that time, Mr. Hannigan was driving approximately twenty miles an hour, in a westerly direction toward Highway 23. The record discloses that 428 feet east of the defendant's railroad crossing is a standard highway sign directing motorists' attention to the fact there is a railroad crossing and that they are approaching it. Just west of the railroad crossing sign is a house, occupied by Mr. and Mrs.

338

Darrell Jones, which is 338 feet from the center of the house to the railroad crossing. A track and highway profile map showing the gradient was admitted in evidence and examination discloses that the gradient of both the highway and the railroad was minimal, in that a person standing contiguous to the railroad crossing could see approximately a mile down the highway in either direction and down the railroad track in either direction. All of these matters and the exhibits reveal that no substantial obstruction to the vision of a motorist existed at or near the crossing.

The record further discloses that an expert on stopping distance was called and testified that the Studebaker car of the deceased, with reaction and braking time would stop within 43 feet at 20 miles an hour, would stop within 59 feet at 25 miles an hour, would stop within 80 feet at 30 miles an hour and within 154 feet at 45 miles per hour.

The record discloses a completely unobstructed view of 120 feet that the decedent had toward the north, approaching the railroad crossing. There was an electrical substation surrounded by a cyclone fence which was approximately 30 x 40 feet in dimension. The transformers and the other electrical apparatus were in a space approximately 20 x 12 feet, and to the northeast of this electrical switchyard, within the cyclone fence was a small building. This electrical switchyard was 120 feet east of the railroad track and 45 feet east of the right shoulder or north shoulder of the highway the decedent was traveling on. About 630 feet north of the crossing and 75 feet east of the track was a clump of foliage about 7 feet high and 12 feet in diameter. The second foliage was approximately 950 feet north of the highway, 40 feet east of the track and had a diameter of about 10 feet and was 10 feet high. The panoramic view of the area introduced and admitted in evidence discloses that the decedent, Hannigan, had an unobstructed view, save and except the items of obstruction just mentioned and none of the obstructions were within the zone of safety of the decedent.

This train was not unlike the fabled "Toonerville Trolley", in that it was the only train operating on the branch-line between Glendive and Sidney, except such times as they had extras in the sugar beet season in the late Fall of the year. One could reasonably say that this train would arrive at any designated station shortly after you heard the whistle of the train, in that it operated within the federal regulation that compelled it to make the round-trip from Glendive to Sidney and return within fifteen hours and fifty-five minutes. There was a speed restriction of 30 miles per hour on the speed of this train at all times.

For the sake of clarification of railroad vernacular it has been for many years the custom and habit of railroad men to designate an emergency stop by using the expression "dynamite", which appears frequently in the transcript. Such expression means the emergency application of brakes, and comes from the fact that in the old days of triple valves on each car, a dirty triple valve on any single car of the train would cause an emergency application of the brakes, over which the engineer had no control and was called by all and sundry as "dynamiting", hence this expression.

There appears in the record frequent reference to "yard limit board". The yard limit board in this case had no bearing on the cause in that it was south of the depot and 7,414 feet to the north of the crossing and it controlled northbound traffic only.

The testimony discloses that all Northern Pacific diesel engines are equipped with an automatic speed recorder which is in the form of a magnetic tape. The stylus moving up and down on this tape records the speed of the train at any given point. It will also record an emergency stop or a service application of the brakes approaching a depot or any place where the train stops. This tape is installed in the roundhouse and is not accessible to any member of the crew of the train, as it is sealed by the person installing it. It is removed after each trip made

by the engine. There was admitted in evidence, the magnetic tape which is a silent recording witness to the speed of the train in question at all times from its departure in Glendive to Sidney and its return to the point of the accident and thereafter to Glendive, which indicated an approximate speed of 30 miles per hour at the point of collision. It corroborated in every detail the testimony of the crew on the locomotive relating to the operation of the train.

A careful review of the transcript discloses that the decedent Hannigan left the site of the M.D.U. plant about the same time that the train of the defendant left the depot at Sidney.

Respondent vigorously contends that the accident occurred while Engineer Stiefvater and Fireman Ramberg interchanged their positions in the cab of the diesel locomotive. The record discloses a seeming conflict in the testimony of the two men. Ramberg believing that he interchanged positions with Stiefvater at the Sidney depot. Engineer Stiefvater thought that the change was made at the yard limit board which is 7,414 feet north of the crossing. From the record on this point it can be fairly assumed that this interchange of positions was accomplished at least one mile north of the crossing. This change in position of the engineer and fireman put Mr. Stiefvater and the head brakeman Ayers on the left-hand side of the diesel or on the east side of the diesel as it proceeded in a southerly direction.

By reason of the diesel construction in the cab, head brakeman Ayers' vision was restricted to objects directly in front of him through a window which was some 18 x 28 inches in size. The side of the cab was steel with no window in it so he could not see to his left or to the east. The engineer, the fireman who was operating the diesel, and the brakeman all testified that Mr. Ramberg blew the standard crossing signal which is two longs, a short and two longs, at the whistle post which was 1,326.9 feet from the crossing, which will be designated as Highway 23 crossing. Richard Buxbaum who resided 700 feet east

of the crossing, and Mrs. Harold Buxbaum testified that they heard the whistle up to the point of impact. Fireman Ramberg testified that he blew the whistle and turned the automatic bell-ringer off after the accident.

The magnetic speed tape recorder showed that from the time the brakes on the train became effective to the time where the train reached a standing position, it had traveled 863 feet. From the south edge of the bridge on the railroad, which was north of Highway 23 crossing, 206.6 feet, it would therefore appear as he testified that Engineer Stiefvater dived across the cab and put the automatic brake valve in the emergency position or "dynamited" the train about 150 feet north of the crossing. This act automatically shut off the power on the diesel engine.

Witness John J. Kelly, who resided nearby this crossing testified that he was working in the ditch just 25 feet south of the railroad bridge, that he heard the train whistle at the whistle-post, and he heard it whistle again at the bridge.

Witness Robert M. Cain was employed by the defendant Railroad Company as a road foreman of engines and prior to the time he was promoted to the position of engineer in April of 1944, he worked continuously from 1948 to 1956 as railway engineer. He qualified as an expert on the automatic speed recorder and on air brakes. Mr. Cain testified that about two or three seconds would elapse after the automatic brake valve was put in the emergency position, before there was any appreciable brake application and that a period from seven to nine seconds would elapse before the brakes on the train became fully effective, rendering maximum braking power. He further testified that the operation of the sander was nearly instantaneous from the time the valve was turned on.

The engineer, Mr. Stiefvater, called as an adverse witness and gave testimony as follows:

"Q. Did you continue to watch it up until the time you got to the crossing? [It meaning Hannigan's automobile.] A. Well then, I seen he wasn't going to make it.

"Q. How close was it? A. I figure 150 feet from the crossing and I seen he was still coming and I said he will not make it.

"Q. In other words at the time you were 150 feet north of highway 23 crossing you concluded that Hannigan wasn't going to make it? A. That is right.

"Q. In other words you concluded the train was going to hit it? A. That is right.

"Q. Did it slow down at all as it approached the crossing? A. No, and he didn't speed up.

"Q. What made you think he wasn't going to make it? A. It was my judgment he was too close.

"Q. Immediately when you saw that, what did you do? A. I jumped over and put this train into emergency.

"Q. You dynamited it? A. Yes.

"Q. As I understand your testimony the train would have been approximately 150 feet north of this highway 23 crossing when you dynamited it? A. That is right.

"Q. When you dynamited it, I assume you mean you gave it the full treatment, full pressure? A. That is right."

It further appears from the testimony that Stiefvater saw this car some half or three-quarters of a mile coming toward the crossing and he continued to watch it, until a point about 150 feet when engineer Stiefvater, realizing that Hannigan was not going to stop dived for the emergency brake. The train was put in emergency, the sander on, the bell and whistle active, but the impact occurred.

As to the actions of Hannigan, the mute evidence was described by the testimony of James Fisher, Montana Highway Patrolman, as follows:

"Q. Referring to your testimony about your investigation with reference to skid marks, you said there was a complete absence of skid marks on the highway east of the tracks, do you recall that? A. I do.

"Q. In other words you didn't find any skid marks there at all? A. I did not.

"Q. You, in your official capacity and as an experienced patrolman, would that indicate anything in particular? A. It would only indicate one thing to me, that the man simply drove in front of a train. In other words he was completely unaware of any accident about to happen, or any knowledge of the train being near. There would be only one other reason, and that would be to commit suicide and that wasn't the fact in this case."

The amended complaint filed contained four counts. They are (1) the first count which was based on ordinary negligence of the defendant and its employees. The second count which was based on the extra-hazardous crossing doctrine. The third which was based on the last clear chance doctrine and alleging that decedent was completely unaware of the approach of the train, and that the defendants or some of them in the exercise of reasonable care should have seen the decedent's car was being struck and should have slowed down the locomotive to avoid crashing the car. The fourth count charged the defendants with wilfully omitting to ring the bell, slow down the train, driving the train too fast and failing to put up a proper warning signal, watchman or flagman and in wilfully failing to keep a proper lookout, and failing to keep the locomotive under proper control, alleging that these acts were wilful, wanton, reckless or wrongful. On motion, the court took from the jury, the first two counts.

By reason of the trial court's rulings the cause went to the jury on two theories: (1) last clear chance, and (2) wilful misconduct of one or more of the defendants. All of the questions involved encompass these two theories.

It is therefore incumbent for this court to consider first, and rule on the applicability herein of the last clear chance doctrine, vigorously opposed by the appellant.

Crystal clear in this record are uncontroverted facts which remove from this cause the last clear chance doctrine. The facts are:

(1) Decedent Hannigan was familiar with this crossing having used it twice a day for a period of months;

(2) Defendant's train was a daily train with variable times of using this crossing twice a day;

(3) The speed of the train was a constant 30 miles per hour;

(4) The stopping distance of decedent's car is heretofore given;

(5) The stopping distance of the train, in emergency, was 863 feet;

(6) The decedent had, except two obstructions mentioned herein, a visual view north to the approaching train of 615 feet; and

(7) The decedent while driving at an angle into the sun, had more than a ninety degree vision toward the train, devoid of the rays of the sun.

Apropos, the duty of a motorist approaching a crossing this court in Everett v. Hines, 64 Mont. 244, 259, 208 P. 1063, restated the rule announced in Sherris v. Northern Pac. Ry. Co., 55 Mont. 189, 175 P. 269, and quoting from the case of George v. Northern Pac. Ry. Co., 59 Mont. 162, 171, 196 P. 869, stated:

" 'Every person is bound to an absolute duty to exercise his intelligence to discover and avoid dangers that may threaten him. When, therefore, a plaintiff asserts the right of recovery on the ground of culpable negligence of the defendant, he is bound to show that he exercised his intelligence to discover and avoid the danger, which he alleges was brought about by the negligence of the defendant.' This statement of the rule requires the person approaching a railway crossing to take all reasonable precautions to assure himself by actual observation that there is no danger from an approaching train. The failure of the persons in charge of the train to keep a lookout and to give warning signals of its approach to the crossing does not relieve the traveler from the

necessity of making a vigilant use of his senses to ascertain whether it is safe to proceed. [Citing cases.] It is not always sufficient if he does look and listen. The obligation resting upon him is to exercise care to make the act of looking and listening reasonably effective. Sprague v. Northern Pacific Ry. Co., 40 Mont. 481, 107 Pac. 412. If he goes upon the crossing without taking this precaution, he is guilty of contributory negligence, and, if injured, can not recover."

The record here discloses that the decedent Hannigan drove steadily, with neither pause, hesitation nor stop to his death.

Contrast this with the acts of Engineer Stiefvater who leaped across the cab of the diesel, put the automatic brakes in full emergency and applied the sanders before decedent's car was in the zone of danger. The engineer had done everything within the scope of human conduct to avoid this accident.

Appellant cites 34 specifications of error, but only one will be necessary to the determination of this case, by reason of the prior opinions of this court and the statutes applicable.

Section 72-164, R.C.M.1947, states, in part:

"* * * provided, however, all persons driving motor vehicles upon the public highways of this state, outside of corporate limits of incorporated cities or town, where the view is obscure or when a moving train is within sight or hearing, shall bring said vehicle to a full stop not less than ten (10) nor more than one hundred (100) feet from where said highway intersects railroad tracks within this state, before crossing the same, at all crossings where a flagman or a mechanical device is not maintained to warn the traveling public of approaching trains or cars."

Under the facts, this court is compelled to follow the rule in this jurisdiction appertaining to the last clear chance doctrine.

In Pollard v. Oregon Short Line R. R. Co., 92 Mont. 119, 11 P.2d 271, this court said that "in order to state a cause of action under the last clear chance doctrine, the pleader must disclose (1) the exposed condition brought about by the negli-

gence of the plaintiff, or the injured party; (2) the actual discovery by the defendant of the perilous situation of the person or property in time to avert collision; and (3) the failure thereafter of the defendant to use ordinary care to avert the injury.

"* * * In order to state a cause of action for damages for personal injuries, the complaint must always disclose a legal duty owing from the defendant to the injured party, and a negligent breach thereof, resultant damages, and that the breach of the duty was the proximate cause of the injury. Griffin v. Chicago, M. & St. P. R. Co., 67 Mont. 386, 216 P. 765; Ecclesine v. Great Northern Ry. Co., 58 Mont. 470, 194 P. 143."

To the same effect is Burns v. Fisher, 132 Mont. 26, 313 P.2d 1044, 67 A.L.R.2d 1; Armstrong v. Butte, A. & P. Ry. Co., 110 Mont. 133, 99 P.2d 223; Sorrells v. Ryan, 129 Mont. 29, 281 P.2d 1028; and Gustafson v. Northern Pacific Ry., 137 Mont. 154, 351 P.2d 212.

As this court said in Gustafson v. Northern Pacific Ry. Co., supra, "a defendant may defeat a plaintiff's claim in a last clear chance case by showing that plaintiff's negligence operated up to the time of the injury as a proximate cause thereof."

We conclude that the decedent Hannigan's failure to stop was the primary and proximate cause of the accident. The evidence adduced justifies this conclusion.

The trial court should have sustained the motion of the appellants to strike the third cause of action relating to last clear chance.

This leaves the fourth cause of action which charged a number of reckless, wilful, wanton, and wrongful acts or omissions by the appellants. This fourth cause of action was the subject of a motion by the appellants that it be taken from the jury. As hereinbefore indicated, in the trial of the issues, the testimony was interwoven, much of it going to the issue of the last clear chance doctrine previously discussed.

The appellants urge that where continuing contributory negligence is shown as here, that it is a bar to recovery. Respondent, on the other hand, urges that contributory negligence is not a defense to wilful and wanton misconduct of appellants.

The "wilful and wanton" acts charged, viewing the testimony in a light most favorable to the prevailing party, and deeming every fact proved which the evidence tends to prove (LeCompte v. Wardell, 134 Mont. 490, 333 P.2d 1028), were:

1. Failure of defendants to give any signal of the train's approach to the crossing by ringing a bell or blowing a whistle;

2. Failure to keep the locomotive under proper control;

3. Failure to operate the locomotive at a proper rate of speed;

4. Failure to install or maintain proper warning signals, lights, or other precautionary measures, or to have a watchman or flagman at said crossing;

5. Failure of defendants to keep a proper lookout for traffic on the highway; and

6. That the engine crew was in the act of changing positions in the cab.

The foregoing acts are listed by respondent, and for our purpose here, we shall consider them as being facts which the evidence tends to prove, although we do not so hold or indicate.

In LeCompte v. Wardell, 134 Mont. 490, 333 P.2d 1028, this court discussed wilful and wanton conduct, although the case was decided on the principle that as to licensees, the possessor of property is required to refrain from active negligence, as distinguished from passive negligence. In the Le-Compte case, this court quoting from 38 Am.Jur., Negligence, § 178, pp, 855, 856, stated:

"A defendant's act is properly characterized as wilful, wanton, or reckless, within the meaning of the foregoing rule, only when it was apparent, or reasonably should have been apparent, to the defendant that the result was likely to prove disastrous to the plaintiff, and he acted with such indifference

toward, or utter disregard of, such a consequence that it can be said he was willing to perpetrate it." (See also Haddox v. Northern Pacific Ry. Co., 43 Mont. 8, 113 P. 1119.)

Previously in Liston v. Reynolds, 69 Mont. 480, 223 P. 507, this court held that under an allegation of "gross negligence", any lesser degree of negligence might be relied upon for recovery, holding at the same time that where wilful conduct is involved, a showing of negligent conduct will not sustain a recovery. It was there said that "there was no evidence of wilful or intentional injury, and there is not under our decisions any such thing as 'wilful negligence.' "

For a definition of what is termed a reckless disregard of safety see Restatement of Torts, § 500.

Now, applying these principles to this case, we think that the crossing involved may have been such as to require a consideration by the jury of the fourth cause of action. We realize that appellants assert that the removal of the second cause of action concerning an extra-hazardous crossing takes this question from the case, but a reading of the numerous motions and rulings indicates that the trial judge felt that the issue was framed by the fourth cause of action.

The dissenting opinion of Mr. Justice John C. Harrison makes two points that must be noted. First, the Monforton case did *not* involve the issue of "last clear chance" since it was not pleaded.

Second, the dissent states as a fact that the witness Stiefvater, the engineer sitting in the fireman's position, "clearly shows that because of the glare of the sun on the windshield of the car of Hannigan, that he [Steifvater] had some question in the back of his mind about the ability of the driver of the car to see the approach of the train." Such a statement flies into the teeth of the facts in that to see the approaching train, or to look for one, the driver would look more than ninety degrees to his right away from the sun.

Therefore, by what has been discussed heretofore, the judg-

ment is reversed, and the matter remanded to the district court for a new trial on the fourth cause of action.

MR. CHIEF JUSTICE JAMES T. HARRISON and MR. JUSTICE CASTLES, concur.

MR. JUSTICE JOHN C. HARRISON dissenting.

I dissent.

First, it is obvious from a study of the transcript in this case that the court in trying the case carefully considered, as a guideline throughout the trial of the case, this court's holding in the last railroad crossing case, Monforton v. Northern Pac. R. R. Co., 138 Mont. 191, 355 P.2d 501, and tried the case within the boundaries set by that case. Having done so, through his instructions as well as through his rulings during the course of the trial of the case, it is my opinion that the case should be sustained.

Secondly, I disagree with the majority opinion on the last clear chance doctrine. A reading of all of the testimony of Stiefvater, the engineer, who had exchanged places with the fireman, and who observed the car coming down the road for a considerable period of time, clearly shows that because of the glare of the sun on the windshield of the car of Hannigan, that he had some question in the back of his mind about the ability of the driver of the car to see the approach of the train. In spite of his watching this car for quite a period, in spite of the fact that he could not see into the car due to the fact that there was a glare off of the windshield which prevented his seeing into the car, which also should have warned him of the fact that the driver was approaching into the sun, he did nothing to warn the acting engineer at the time to either slow down or stop the train for the crossing. This evidence is such that it was a matter to be submitted to the jury and resolved by them.

MR. JUSTICE ADAIR, dissenting.

I am unable to agree with the majority opinion herein, and

350

think that such majority opinion closely parallels the majority opinion in the case of Monforton v. Northern Pacific Ry., 138 Mont. 191, 355 P.2d 501, in which latter case I registered my dissent.

The instant Hannigan case was carefully tried to a jury on what I consider proper and appropriate instructions and I do not think the jury's verdict should be disturbed, nor should the judgment rendered on such jury's verdict be nullified. This court consisting of five members sits as an appellate court and not as a jury.

I would affirm the judgment of the district court made in conformity with the jury's verdict in the instant case.